FILED

MAR 2 5 2008

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| In re<br><br>Clarence Michael Hurst and<br>Sandralee Mary Hurst<br><br>Debtors. | Case No. 05-17817-B-7<br><br>DC No. DAC-3 |

**MEMORANDUM DECISION REGARDING ATTORNEY'S
FINAL APPLICATION FOR COMPENSATION**

This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of res judicata and claim preclusion.

James E. Salven appeared in his capacity as the chapter 7 trustee (the "Trustee").

Before the court is the final application for compensation (the "Application") filed by Dorothy A. Carroll, Esq. ("Carroll"), attorney for the Trustee. The Application was filed in conjunction with the Trustee's final report. For the reasons set forth below, the Application will be granted in part and denied in part.

This memorandum decision contains the court's findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a), made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 7052. The court has jurisdiction over this matter under 28 U.S.C. § 1334 and 11 U.S.C. § 330[1] and General

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted and promulgated *prior* to October 17, 2005, the effective date of The

Orders 182 and 330 of the U.S. District Court for the Eastern District of California. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A).

**Background and Findings of Fact.**

Clarence and Sandralee Hurst ("Hursts") filed a chapter 7 petition on September 26, 2005. The Hursts' Schedule B listed "Proceeds from the sale of residence in 1/05" with a value of $8,117. They claimed these funds as exempt. In the Hursts' Statement of Financial Affairs, they listed the sale of their primary residence (the "Residence") to Mario Viramontes ("Viramontes") in January 2005 for $170,000. They listed rental payments of $950 per month to Viramontes which suggested that they were still residing in and renting the Residence from Viramontes. Their relationship to Viramontes was stated as that of "Friend." There were no nonexempt assets in the Schedules and the case was originally noticed to creditors as a "no-asset" case. The Hursts' discharge was entered without objection in January 2006. As a "no-asset" case, the Trustee would have filed his final report and the case would have closed shortly thereafter. Had the Trustee closed the case as a no-asset case, he would have received a fee of $60.

The Section 341 meeting of creditors was concluded on November 18, 2005 (the "§ 341 Meeting"). The Trustee apparently questioned the Debtors regarding the sale of their Residence to Viramontes (the "Viramontes Sale") and concluded, based on that examination, that Viramontes may have purchased the Residence for less than reasonably equivalent value. The Trustee decided to employ counsel to investigate that issue. On November 23, 2005, the Trustee filed his "Report of 341 Meeting" informing the court that there were exempt assets in the estate (the "Asset Notice"). The court infers that the Asset Notice was a result of the Trustee's conclusion that he could either avoid the Viramontes Sale or recover some money from Viramontes to pay creditors. The clerk issued a Notice to File Proof of Claim Due to Possible Recovery of Assets to all

---

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Apr. 20, 2005, 119 Stat. 23.

2

scheduled creditors on November 28, 2005. Five unsecured claims were filed in the approximate amount of $18,000. (A sixth claim was later disallowed on the Trustee's objection because it was a duplicate claim.)

**The Adversary Proceeding.**

Five months after conclusion of the § 341 Meeting, in April 2006, the Trustee applied for authority to employ Thomas H. Armstrong, Esq. ("Armstrong") as general counsel. For reasons that do not appear in the record, Armstrong apparently did nothing in the case.[2] Six months later, on October 9, 2006, the Trustee applied for authority to employ Carroll as general counsel, subsequently moving to substitute Carroll for Armstrong. Both the employment and the substitution were approved.

Carroll's billing records show that she made some effort to evaluate the Viramontes Sale. Carroll's time entries show communication between Carroll and her paralegal and the title company, and legal research regarding Hursts' homestead exemption. Carroll did not actually examine Viramontes or the Debtors, she did not commission an independent (evidence worthy) appraisal of the Residence and she did not formally demand the production of any documents. Nevertheless, the Trustee concluded, presumably based on Carroll's evaluation and advice, that there was enough evidence to warrant the commencement of an adversary proceeding against Viramontes to avoid the Sale as a fraudulent transfer.

Carroll filed that adversary proceeding on October 30, 2006 (adversary no. 06-1300, the "Adversary Proceeding"). The Trustee alleged in the Adversary Proceeding that the Residence was worth at least $195,000. The Trustee also alleged, *inter alia*, that the Hursts sold their Residence with actual intent to defraud creditors, and/or that the Hursts had transferred their Residence to Viramontes for less than the "reasonably equivalent value" (§ 548(a)(1)(B)), and that the Trustee was entitled to avoid the transfer

---

[2] Armstrong did not file any billing records, or make a request for compensation at the conclusion of the case.

3

or recover its value for the estate. Viramontes retained counsel and filed an answer, denying the pertinent allegations.

The initial status conference was held on January 18, 2007. By then, the parties had made their initial disclosure of documents in compliance with Rule 7026(a). Viramontes' initial disclosure of documents included an independent appraisal by a certified residential appraiser, which had been made for the benefit of an independent lender, just prior to the Sale (the "Appraisal"). The Appraisal reported, "the price at which the property was to be sold reflected a value for the property that was in a range of values for similar properties previously sold in the area."[3] Viramontes noted that the Trustee's alleged value of $195,000 was not supported by an appraisal and that the Trustee's valuation did not include any adjustment for the costs of sale that the Trustee would have been incurred had he sold the Residence for the estate. In light of the Appraisal, Viramontes questioned the Trustee's motivation for pursuing the Adversary Proceeding.

**The Settlement.**

The record does not reveal where or how the Trustee got the valuation of the Residence ($195,000) which he alleged in the Adversary Proceeding. In his status conference statement, the Trustee described the valuation as an "estimate."[4] The Trustee did not obtain an appraisal of the Residence or offer proof of any evidence to support that valuation. However, it appears that the Trustee's attitude about the Adversary Proceeding changed after the initial disclosures and status conference. Carroll's billing records suggest that virtually all of Carroll's efforts after the status conference were focused on getting Viramontes to agree to a settlement of the Adversary Proceeding. On January 19, 2007, the day following the status conference, Carroll noted a "[t]elephone call with James E. Salven regarding possible settlement." Thereafter Carroll noticed some

---

[3] Viramontes' Status Conference Statement filed on January 16, 2007.

[4] Plaintiff's Status Conference Statement filed on January 11, 2007.

4

depositions, but none were taken. On March 22, 2007, Carroll filed a Notice of Case Settlement. On May 30, 2007, the Trustee brought a motion to approve a compromise of the Adversary Proceeding (the "Settlement"). The Settlement terms called for Viramontes to pay the Trustee $7,500 in exchange for a complete release of all claims. The Trustee attested that he had considered the impact of the Adversary Proceeding on creditors of the estate, that the litigation was not overly complex, that he believed the estate would ultimately prevail on the fraudulent conveyance claim, but that the uncertainty and time involved made the Settlement the better course. He averred that "the proposed compromise is for and in the best interest of the creditors of this estate and it is my recommendation that the compromise be approved."

Nowhere in the motion to approve the Settlement did the Trustee disclose how much he and Carroll would request for administrative fees, or how much would actually be available for the creditors. There was no opposition to the Settlement. Based on the Trustee's representation, the Settlement was approved. On July 3, 2007, the parties stipulated to dismiss the Adversary Proceeding.

**The Trustee's Final Report.**

The Trustee's Final Report and Proposed Distribution to creditors was filed on August 22, 2007 (the "TFR"). The TFR reveals that Viramontes paid the Settlement ($7,500), which was the only asset recovered by the Trustee, all other assets being exempt.[5] The Trustee requests compensation in the amount of $1,500.70 based on the statutory formula in § 326(a). In this Application, Carroll requests compensation for legal fees in the amount of $5,236 (41.6 hours at the average rate of $125.87 per hour), and reimbursement of expenses in the amount of $243.23. Carroll's billing rate is $190 per hour. She bills for her paralegal at $75 per hour. The Trustee paid the bankruptcy court $250 to file the Adversary Proceeding. All together, the TFR proposes to pay administrative expenses in the amount of $7,057.90. Unsecured claims were filed and

---

[5]The Trustee also collected interest in the estate's bank account in the amount of $6.98.

allowed in the amount of $17,924.54. However, after the administrative expenses, the Trustee only has $199.08 to distribute to unsecured creditors, a proposed distribution of 1.1%.

By billing category, Carroll charged the estate $663 for 1.2 hours of attorney time and 5.8 hours of paralegal time related to her employment and fee applications. Carroll billed the estate $4,468 for 33.2 hours of attorney and paralegal time related to the Adversary Proceeding against Viramontes. Finally, Carroll requests $105 compensation for 1.4 hours of paralegal time related to "case administration." For purposes of this analysis, the "case administration" time will be considered as part of the "Adversary Proceeding" time since Carroll did not work on any other administrative matters.

**Issue.**

In a nutshell, the problem here is that this case was originally filed as a no-asset case; after a minimal investigation the Trustee declared it to be an asset case, inducing a few creditors to file proofs of claim, and then he employed counsel to prosecute the Adversary Proceeding resulting in a settlement that barely covers the Trustee's commission and the attorney fees. After almost two years of work, the Trustee now proposes to close the case, essentially as a no-asset case. The issues before the court are (1) whether the Trustee's prosecution of the Adversary Proceeding was a reasonable exercise of his duties under § 704, and (2) whether Carroll's legal fees were necessary and reasonable.

**Applicable Law.**

A chapter 7 trustee's duties pertinent to this analysis are prescribed in § 704(1) & (4). The trustee *shall* investigate the debtor's financial affairs, collect the property of the estate, reduce it to money, distribute the money to the creditors, and close the estate "as *expeditiously* as is compatible with the best interests of parties in interest." (emphasis added.) "[A] chapter 7 trustee voluntarily assumes a statutory duty under § 704(1) to collect and reduce the property of the estate for which trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest." *In re C.*

*Keffas & Son Florist, Inc.*, 240 B.R. 466 (Bankr. E.D.N.Y. 1999).

There is an undeniable tension between a trustee's duty to both administer the estate expeditiously, and to maximize recovery from the liquidation of assets. "In short, it is the trustee's duty to both the debtor and the creditors to realize from the estate all that is possible for distribution among the creditors." 6 *Collier on Bankruptcy*, (15th Ed. Revised), ¶ 704.02[3] at 704-12. Conversely, the trustee's duty to expeditiously close the estate has been described by courts as the trustee's "main" duty under § 704. *In re Riverside-Linden Inv. Co.*, 85 B.R. 107, 111 (Bankr. S.D. Cal. 1988), *aff'd.*, 99 B.R. 439 (9th Cir. BAP 1989), *aff'd.*, 925 F.2d 320 (9th Cir. 1991) (citation omitted).

Obviously, in an asset case, the trustee needs a reasonable period of time to investigate the debtor's financial affairs and to gather and liquidate the assets. However, any benefit derived from delay is not without an offsetting cost, *i.e.*, the inevitable injury suffered both by the creditors, as lost opportunity costs, and by the debtors, in delaying their "fresh start." In the administration of a chapter 7 case, the trustee must employ a reasonable approach which balances those costs against the potential benefits.

When the chapter 7 trustee employs an attorney to work for the bankruptcy estate, the standard for compensation of that attorney is defined in § 330(a). Section 330(a)(1)(A) authorizes the court to award "reasonable compensation for actual, necessary services rendered" by the attorney. Section 330(a)(1)(B) authorizes "reimbursement for actual, necessary expenses." Section 330(a)(2) authorizes the court to "award compensation that is less than the amount of compensation that is requested." The court must find that the compensation is reasonable. Section 330 (a)(3) requires the court to consider "the nature, the extent, and the value of such services, taking into account all relevant factors." Those "relevant factors" include the time spent, the rates charged, and whether the services "were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of" the bankruptcy case.

Even if the court finds that the services billed by an attorney are "actual," meaning

that the fee application reflects time entries properly charged as legal services, the attorney must still demonstrate that the work performed was necessary and reasonable. *Unsecured Creditors' Committee v. Puget Sound Plywood, Inc. (In re Puget Sound Plywood)*, 924 F.2d 955, 958 (9th Cir. 1991). An attorney employed under § 327 must exercise good billing judgment with regard to the legal services undertaken. *Id.* at 959. The court's authorization to employ an attorney to work in a bankruptcy case does not give that attorney "free reign [sic] to run up a [legal fee] tab without considering the maximum probable [as opposed to possible] recovery." *Id.* at 958. Prior to working on a legal matter, the attorney is obligated to consider:

> (a) Is the burden of the probable cost of legal services disproportionately large in relation to the size of the estate and maximum probable recovery?
>
> (b) To what extent will the estate suffer if the services are not rendered?
>
> (c) To what extent may the estate benefit if the services are rendered and what is the likelihood of the disputed issues being resolved successfully?

*Id.* at 959.

An attorney employed under § 327 is not held to guarantee the result of those legal services. However, the attorney must demonstrate that the legal services billed to the bankruptcy estate were "reasonably likely to benefit the estate when the services were rendered." §§ 330(a)(3)(A) and (a)(4)(A)(ii)(I); *Roberts, Sheridan & Kotel, P.C. v. Bergen Brunswig Drug Company (In re Mednet)*, 251 B.R. 103, 108 (9th Cir. 2000). "A bankruptcy court also must examine the circumstances and the manner in which services were performed and the results achieved in order to arrive at a determination of a reasonable fee allowance." *Id.* When a cost benefit analysis indicates that the trustee and his professionals are the only parties likely to benefit from the professional services, then "the service is unwarranted and a court does not abuse its discretion in denying fees for those services." *Id.* at 109.

A chapter 7 trustee's attorney is responsible for his/her role in prosecuting unsuccessful litigation. Even if the trustee made the decision to pursue the litigation in the first place, the attorney at least acquiesced in the decision. *Leichty v. Neary (In re*

8

*Strand)*, 375 F.3d 854, 859 (9th Cir. 2004). "If the trustee insists on pursuing litigation which is not cost-effective, then the attorney should seek to withdraw or, at least, recommend that the trustee obtain a second opinion." *Id.* citing *Digesti & Peck v. Kitchen Factors, Inc. (In re Kitchen Factors, Inc.)*, 143 B.R. 560, 563 (9th Cir. 1992) (other citation omitted).

**Analysis and Conclusions of Law.**

Neither the Trustee, nor the UST has questioned the fact that nobody will really receive anything from all the work that was done in this case except the Trustee and Carroll. However, the bankruptcy court has an independent duty to review the reasonableness of a professional's fees, even when the trustee who employed that professional does not object. *In re Montgomery Drilling Co.*, 121 B.R. 32, 35-36 (Bankr. E.D. Cal. 1990).

When the facts to support a potential adversary proceeding are discovered by a trustee, the trustee should be prepared to conduct an initial investigation of the facts, utilizing the powers to examine and obtain documents under Rule 2004, if necessary, and make an informed decision whether the facts warrant the employment of a professional to pursue a further investigation. If an attorney is employed to advise and represent the trustee in that effort, that team must prudently expand their investigation of the facts to make sure that the potential claim is sufficiently meritorious to justify the administrative expense and the delay which will result from prosecution of the adversary proceeding. Fed.R.Bankr.P. 9011(b) mandates that that investigation should be done *before* the adversary proceeding is filed.[6]

---

[6]Rule 9011(b) states in pertinent part:
Representations to the Court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, –
(1) it is not being presented for any improper purpose;
. . .

9

Even if the trustee's investigation shows that the potential claim has merit, the trustee must be sure that prosecution of the adversary proceeding is reasonably likely to benefit the bankruptcy estate, meaning the creditors will receive some distribution on their claims worthy of the delay and expenses incurred to administer the estate. Congress did not intend that chapter 7 trustees should pursue "nominal" cases, *i.e.*, cases in which the administrative expenses would consume all or virtually all of the nonexempt assets, leaving little or nothing for the unsecured creditors. See 8 *Collier on Bankruptcy*, (15th Ed. Revised), ¶ 1325.05[2][d] at 1325-21, citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 94-95 (1977) (making clear Congress's disfavor of trustees' administration of nominal asset chapter 7 cases, in which the only beneficiaries are those who administer estate).

Here, the Trustee and Carroll took a no-asset case and filed the Adversary Proceeding with a minimal investigation of the facts. The record suggests that neither the Trustee nor Carroll seriously investigated the facts behind the Viramontes Sale until after the Adversary Proceeding was filed. After the parties exchanged their initial disclosures, including Viramontes' Appraisal, the Trustee's efforts shifted to negotiation of the Settlement which generated just enough, coincidently, to cover the Trustee and attorney fees. Based on Carroll's time records, the court can reasonably infer that the Trustee knew by the time of the status conference, after the initial disclosure of documents, that his valuation of the Residence was questionable and that his ability to avoid the Viramontes Sale was in doubt. In the end, the Trustee's efforts generated virtually nothing for the creditors of the bankruptcy estate - $199.08 after deduction for claimed administrative costs - and delayed closure of the case for almost two years.

Carroll's time records show that she spent 2.7 hours reviewing the file and conducting legal research prior to drafting the complaint. Carroll never obtained an independent appraisal of the Residence before or during the litigation. She spent .8 hours

---

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery;

communicating with the Trustee, her paralegal, and the title company prior to drafting the complaint. Had Carroll spent two or three hours at this point examining the Debtors and Viramontes, and requesting the production of documents, she would have known, presumably that Viramontes had a certified appraisal to support his defense. Carroll spent only 3.7 hours reviewing the file and preparing for the Adversary Proceeding before she started drafting it.

In lieu of further investigation, the Trustee and Carroll decided to file the Adversary Proceeding. Carroll spent another 5.2 hours drafting the Adversary Proceeding and other documents and pleadings, reviewing defendants' answer, communicating with opposing counsel. That time would have been better spent examining the Debtors and Viramontes and requesting disclosure of available documents to make sure that an adversary proceeding was warranted. At the conclusion of the status conference and the telephone call with the Trustee "regarding possible settlement," Carroll had spent a total of 10.2 hours on the case, incurring almost $2,000 in attorney fees plus $345 in paralegal fees and more than $100 in costs. This does not include the $663 incurred in preparing the employment agreement and the fee application.

After the status conference, Carroll spent a total of 6.1 additional hours on the case, including 1.4 hours spent on "discovery." The remainder was spent negotiating and finalizing the Settlement. Carroll's paralegal spent a total of 10.5 hours after the status conference, with four hours spent on further litigation activities and the remaining time spent on the Settlement.

In the court's view, the work which Carroll did preparing and prosecuting this Adversary Proceeding had little to no chance of being either necessary or beneficial to the estate. The court is persuaded that the appropriate compensation for Carroll's work is the time she should have spent investigating the facts before preparing and filing the Adversary Proceeding. A reasonable investigation could have been done in about eight hours. The Settlement which the Trustee extracted from Viramontes appears to be little more than a "parachute," *i.e.*, a way for Carroll and the Trustee to "bail out" of the

Adversary Proceeding with a "soft landing." There was virtually nothing in the Settlement for the creditors, despite the Trustee's representations in support of the Settlement that it was in the "creditors' best interest."

**The "Catch-22."**

The court is fully aware of the "Catch-22" here. Had there been no Adversary Proceeding, there would be no Settlement and no funds to pay Carroll for the work she had done in the case, even time which the court has found would have been reasonable and compensable. However, a bankruptcy trustee should never prosecute an adversary proceeding solely to extract a settlement from the defendant(s). This was first and always a no-asset case. Once the Trustee learned about the Viramontes Sale, he could have done more to investigate the facts before employing an attorney. Once the Trustee approached Carroll about representing the estate, she could have reviewed the available evidence and/or insisted on more investigation before she agreed to that employment. Unfortunately, nonpayment for unsuccessful litigation is one of the risks inherent in the representation of trustees in bankruptcy cases.

The solution to that problem lies in Rule 9011. The trustees and their professionals have a duty to reasonably investigate a potential claim for relief *before* filing the adversary proceeding. First, the trustee should be trained and equipped to do enough discovery - utilizing if necessary the § 341 meeting, Rule 2004 examinations, and the production of documents - to determine whether the employment of an attorney is warranted. The attorney should not accept that employment without carefully reviewing the case. Once employed, the attorney accepts some risk of success. The professional's risk is minimized by an early and efficient investigation of the facts, not by demanding a "parachute" settlement to bail out of unwarranted litigation after it is filed.

**Conclusion.**

Based on the foregoing, the court finds and concludes that pursuit of the Adversary Proceeding was not a reasonable exercise of the Trustee's duties under § 704. The Trustee could have conducted a more comprehensive investigation of the Viramontes

Sale before he employed Carroll. Once employed, Carroll could have conducted a quick and reasonable investigation of the Viramontes Sale, and concluded that it was not worth pursuing, with about eight hours of legal service. Carroll should have been able to prepare her employment and fee application in about two hours. In summary, the court is persuaded that this case could have been reasonably administered with about ten hours of attorney time. At Carroll's billing rate, that fee would be $1,900. Accordingly, Carroll will be awarded fees for her legal services in the amount of $1,900. Carroll's costs will be reimbursed in the amount of $243.23. The balance of Application will be denied.

Dated: March 25, 2008

W. Richard Lee
United States Bankruptcy Judge